**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) | |
| 100 F Street, N.E. | ) | **Civil Action No.** |
| Washington, D.C.  20549 | ) | **COMPLAINT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **EDWARD S. PLINER,** | ) | |
| 13 Locust Street | ) | |
| Salem, MA  01970 | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges

that:

## SUMMARY

1.      Between 1997 and 2001, Raytheon Company and certain members of its senior

management ("Raytheon" or the "company") made false and misleading disclosures and used

improper accounting practices that operated as a fraud by masking the declining results and

deteriorating business of Raytheon Aircraft Company ("RAC") and inaccurately reporting the

company's operating results on both a segmented and consolidated basis.  As set forth below,

certain of these disclosures and accounting practices were undertaken by or with the knowledge

of senior company officers, including Edward S. Pliner ("Pliner"), the lead engagement partner

on the Raytheon audit from 1997 through 1999 and the company's Corporate Controller from

early 2000 through late 2002.

2.      From 1997 through 1999, Raytheon prematurely recognized revenue on RAC's

sale of unfinished aircraft through improper "bill and hold" transactions.  As a result, the

company materially overstated RAC's net sales by approximately $80 million at year-end 1997

and $110 million at year-end 1998, which led to 13 percent overstatements of the subsidiary's annual operating income in both of these periods. These errors also enabled both Raytheon and RAC to meet certain internal and external earnings targets. In January 2000, the company restated for the material errors related to RAC's improper bill and accounting practices.

3.      In addition, between 1997 and 2001, Raytheon failed to fully and accurately disclose known risks, trends, uncertainties, and other information concerning the deteriorating state of RAC's commuter aircraft business and the negative impact this decline was having on asset values associated with RAC's line of nineteen-seat, turboprop aircraft (the "commuters" or the "1900s") and, thus, on the company's (including RAC's) results of operations. Raytheon also engaged in several improper accounting practices that delayed and mischaracterized known losses associated with RAC's commuter line during this time period.

4.      As Raytheon's lead auditor, Pliner was aware of certain bill and hold and commuter accounting practices at RAC, which he knew or should have known were improper. Yet, he signed unqualified audit opinions for the 1997 and 1998 audits, which represented that the company's financial statements "present fairly, in all material respect, the financial position of Raytheon Company and Subsidiaries Consolidated…and the results of their operations…in conformity with generally accepted accounting principles." As Raytheon's Controller, Pliner continued to be aware of and involved in certain on- and off-balance sheet commuter accounting, which he knew or should have known did not accurately reflect the negative impact of declining commuter values in Raytheon's financial statements. Pliner further did not make or ensure the timely, accurate, and full disclosure of material commuter trends and uncertainties in Raytheon's SEC filings during 2000 and 2001, and he also did not ensure that the company maintained an adequate system of internal accounting controls related to these assets.

2

5.     Had Raytheon properly accounted for its commuter assets, the company would have reported material reductions in RAC's reported operating income of at least $34 million, $22 million, and $21 million at year-end 1998, 1999, and 2000, respectively, which represented 13 percent of the subsidiary's reported annual operating income in each of these periods.

6.     RAC's operating results would have been further reduced by at least $67 million (41 percent) at year-end 2000 had Pliner and others in senior Raytheon and RAC management timely and appropriately recognized losses inherent in a planned "soft landing" of the commuter aircraft line.  Internal company documents and other information further indicate that, at this time, these and other senior executives expected commuter losses of $240 million given the cash sales prices that had been approved in the "soft landing," and a charge of $67 million to $240 million would have reduced Raytheon's 2000 profit before taxes by at least 8 to 27 percent. Pliner and others, however, caused Raytheon to improperly take this charge in the third quarter of 2001, when the company wrote down its on-balance sheet commuter assets and increased reserves for its off-balance sheet commuter receivables by a total of $693 million after the terrorist attacks of September 11th.  Given the charge that the company should have taken at year-end 2000, Raytheon's third quarter 2001 commuter loss provision was materially overstated by at least 10 to 53 percent.

**JURISDICTION**

7.     This Court has jurisdiction over this matter pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v] and Sections 21(d)(3)(A) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d)(3)(A) and 78aa].

**DEFENDANT**

8.      Pliner, age 49, has been a Certified Public Accountant licensed in Massachusetts at all relevant times.  During 1997 through February 2000, Pliner served as the lead engagement partner on the audits of Raytheon's financial statements.  From approximately April 2000 until December 2002, Pliner served as Raytheon's Controller and then became the company's CFO.

**BACKGROUND**

9.      Raytheon is a Delaware corporation, headquartered in Waltham, Massachusetts. The company is an industry leader in defense, government electronics, space technology, and business and special mission aircraft.  Between 1997 and 2001, Raytheon reported between $13 billion and $20 billion in net sales revenue annually and employed between 75,000 to 120,000 individuals.  During this time period and continuing through today, Raytheon's securities have been registered with the Commission pursuant to Section 12(b) of the Exchange Act and listed on the New York, Chicago, and Pacific Exchanges.

10.     In the early 1990s, Raytheon was a diversified, multi-national conglomerate, which operated in the defense, electronics, engineering and construction, major appliances and aircraft businesses.  The company formed RAC in 1994 through the combination of Beech Aircraft and Raytheon Corporate Jets, and the wholly-owned Raytheon subsidiary has been reported as a separate segment in all of the company's public filings since that time.

11.     RAC manufactures, markets, and services business jets, turboprops, and piston-powered aircraft for the world's commercial, fractional ownership, and military aircraft markets. Due to the cyclical nature of these markets, RAC often experienced fluctuating results.  For example, between 1997 and 2001, RAC generated between $2.3 billion and $3.2 billion in net sales revenue for the company annually, accounting for 13 to 19 percent of Raytheon's consolidated sales revenues.  In addition, while the revenues generated by the commuter aircraft

4

product line represented approximately 1 percent of Raytheon's consolidated net sales revenue during this time period, the company's financing of those sales left Raytheon with substantial recourse obligations related to over $1 billion in commuter receivables that were off the balance sheet.

12.    In 1997, Raytheon completed two multi-billion dollar defense acquisitions in an effort to streamline its operations and solidify its position as one of the nation's largest military contractors. These acquisitions led to a doubling of Raytheon's long-term debt load (increasing it to over $8 billion) and a substantial lowering of Raytheon's credit rating. In an effort to reduce the burden of its debt expense on earnings and cash flows, Raytheon began to divest many of its "non-core" commercial units, using the cash generated by these sales to pay down debt it incurred as a result of its defense acquisitions. RAC was considered for divestiture as part of this plan.

## RAYTHEON'S IMPROPER BILL AND HOLD AIRCRAFT SALES

13.    Between 1997 and 1999, RAC prematurely recognized revenue on improper "bill and hold" aircraft sales (also known as "green sales" or "financial deliveries") that did not comply with generally accepted accounting principles ("GAAP").

14.    In particular, every quarter and more often at the end of the fiscal year, members of senior RAC management held "executive review sessions," in which they identified unfinished planes in the production process that could be "pulled forward" for a "financial delivery" to "bridge" certain "gaps" or "shortfalls" in RAC's performance targets. It was inappropriate to recognize revenue on these sales because the aircraft were not complete and ready for shipment, the seller (RAC) and not the purchaser had requested the bill and hold sale, and significant incentives (including no-interest loans during the completion period) were being

given to customers in order to induce them to accept a "sale" before quarter- or year-end, all of which disqualified the aircraft for sales treatment under GAAP.

15.     In 1997, RAC's green sales resulted in an $80 million overstatement of the subsidiary's net sales, which artificially inflated RAC's quarterly operating income by between 13 and 28 percent, the subsidiary's annual operating income by 13 percent, and Raytheon's annual earnings by 7 cents per share. Raytheon did not disclose RAC's non-GAAP bill and hold practices in any of its 1997 Forms 10-Q or its Form 10-K, which each noted RAC's "record sales" and "record operating income." In January 1998, the company filed a Form S-3 registration statement and subsequent prospectus supplements for a $3 billion shelf registration and takedown of securities. These filings made no mention of RAC's improper bill and hold accounting and also incorporated by reference Raytheon's prior misleading periodic reports as well as all future periodic reports that Raytheon would file with the Commission.

16.     In 1998, RAC's bill and hold sales inflated the segment's quarterly operating income by 20 and 100 percent in the second and fourth quarters, respectively, and RAC's annual operating income by 13 percent. Raytheon, however, did not disclose RAC's bill and hold practices in its 1998 SEC filings but again described RAC's "record" sales and operating income and "increased" aircraft shipments. In December 1998, Raytheon was aware that RAC had only been able to achieve its year-end sales and profit goals through "significant green sales" activity, which increased the company's fourth quarter earnings by 8 cents per share. As a result, Raytheon met analyst expectations that quarter. Raytheon's 1998 Form 10-K, however, stated that "Revenue from aircraft sales are generally recognized at the time of shipment," omitting a description of RAC's non-GAAP bill and hold accounting practices.

17.    In 1999, RAC's improper bill and hold sales practices led to material misstatements of the subsidiary's operating income in the first, second, and third quarters. Raytheon again made no disclosure of these practices. In July 1999, the company filed another Form S-3 registration statement and subsequent prospectus supplements related to its $3 billion shelf registration and takedown of securities. These filings made no mention of RAC's improper bill and hold accounting practices and also incorporated by reference Raytheon's prior misleading periodic reports as well as all future filings made by the company.

18.    At year-end 1999, Raytheon restated its prior financial results to correct the improper bill and hold accounting that had occurred prior to that time, which indicated that the company had materially misstated RAC's reported quarterly and annual operating income in the nine Forms 10-Q, and two Forms 10-K that the company had filed during fiscal years 1997, 1998, and 1999. The company's disclosures during this time period, however, improperly suggested that the restatement was due to the recent issuance of Staff Accounting Bulletin No. 101 in December 1999, which merely reiterated long-standing guidance on bill and hold transactions, instead of the improper accounting practices that had occurred at RAC with the knowledge and involvement of senior management prior to that time.

**As Raytheon's Lead Auditor, Pliner Was Informed of RAC's Bill and Hold Practices**

19.    As the lead engagement partner on the 1997 and 1998 Raytheon audits, Pliner was provided documentation from the RAC audit team showing that (i) the planes which comprised RAC's green sales were not "complete" and "ready for shipment," (ii) RAC (the seller) and not the buyer was requesting the bill and hold delivery, and (iii) RAC management would further offer "fairly sizable incentives" (including no-interest loans) to induce the customer to accept a bill and hold sale prior to quarter- or year-end. Each one of these factors disqualified the

transaction for sales treatment under GAAP. Pliner was also provided documentation by the RAC audit team showing that the subsidiary's green sales had increased by 25 planes (66 percent) between 1997 and 1998. Pliner further knew that RAC had met its year-end 1998 profit and sales numbers due to its green sales activity. In 1998 and 1999, Pliner was also aware that the SEC had concerns with premature revenue recognition by public companies.

20.    Yet, he and others on the audit team did not object to or raise any issues with Raytheon's improper accounting and disclosure practices related to RAC's non-GAAP bill and hold sales, as described in Paragraph Nos. 13 through 19 above. Instead, they continued to follow an approach that had been established on the audit before Pliner became engagement partner, which among other things provided that revenue could be recognized on aircraft that were not ready for delivery so long as they were "substantially complete" or "over 97% complete." This advice contradicted long-established guidance for bill-and-hold transactions.

21.    Moreover, Pliner signed unqualified opinions for the 1997 and 1998 audits, which he knew or should have known misleadingly represented that Raytheon's financial statements comported with GAAP. Pliner was also aware that the 1997 audit report was incorporated by reference as part of Raytheon's January 1998 offering and the 1998 audit report was incorporated by reference as part of Raytheon's July 1999 offering.

## RAYTHEON'S IMPROPER ACCOUNTING AND DISCLOSURES FOR ITS COMMUTER BUSINESS

22.    Between 1997 and 2001, Raytheon also deferred substantial losses related to RAC's line of commuter aircraft. These planes were typically used by small, thinly capitalized airlines to transport passengers along regional or local routes. These carriers were generally seen as significant credit risks, were thus frequently unable to obtain independent financing for their

aircraft purchases, and typically lacked sufficient cash on hand to make outright purchases of RAC's commuter aircraft.

23.      As a result, RAC rarely sold its new or used 1900s for cash.  Instead, over 90 percent of RAC's sales were financed by the subsidiary's captive finance company, Raytheon Aircraft Credit Corporation ("RACC"), which often offered below-market interest rates and other favorable terms to customers in order to increase demand for the 1900s.  RAC also regularly took used commuter aircraft (model 1900Bs and 1900Cs) in trade for the purchase of newer planes (model 1900Ds), which left RAC with a supply of used 1900s in inventory.

24.      RACC sold most of its aircraft receivables, including commuter financing receivables, into a revolving credit facility funded by an outside bank syndicate, which removed the debt associated with these financed sales from the company's balance sheet.  Under the terms of the credit facility agreement, Raytheon was obligated to re-purchase certain delinquent and defaulted receivables, and the level of recourse to Raytheon on the commuter receivables generally ranged between 75 to 100 percent depending upon the type of financing.  RACC also renegotiated and restructured many of the payment arrangements it had with certain RAC customers in order to keep these customers from becoming overly delinquent or otherwise defaulting on their notes.

### The Declining Commuter Market between 1997 and 1998

25.      During the late 1990s, RAC began to experience softening demand for its commuter aircraft due to, among other things, shifting consumer preferences, increased government regulation of nineteen-seat aircraft, increased competition in the used aircraft market, and the introduction of regional jets.  These and other factors combined to place downward pressure on the sales prices, lease rates, and asset values of these planes.  Thus, in

1997, RAC began for the first time to place used 1900s with customers on operating leases and substantially ceased outright sales of used 1900s for cash.

26. In addition, many of the used commuters that RAC received as returns, repossessions, and trade-ins required significant refurbishment before RAC could re-market them. These refurbishment costs were capitalized as part of the aircraft's book value, which led to "[h]igher book values" that "can and do exceed fair market value." In response, RAC adopted a policy of depreciating the used commuter aircraft on an accelerated basis during the life of their leases to "bring down values" to amounts that were more likely to be recovered in later cash sales. By so doing, RAC improperly deferred and re-characterized impairment losses associated with high commuter book values as ordinary depreciation.

27. As Raytheon's lead auditor and later as Corporate Controller, Pliner was repeatedly informed that "[t]he most significant accounting issue for used commuters is the realizability of assets. Management's plan is to lease the aircraft, depreciated them down to 50% of book value over 10 years, and sell them to the freighter market at the end of the lease." Other Raytheon and RAC executives, including a senior financial officers in corporate and at the subsidiary, were also aware of this strategy and its effects.

28. In April 1998, Raytheon's internal audit department identified that the capitalization of RAC's refurbishment costs was leading to inflated book values for the commuter aircraft. Although senior RAC management agreed to establish limits on the carrying values of used 1900Cs at $3.4 million to $3.7 million in April 1999, at year-end, more than twenty 1900Cs in inventory had book values of more than $4 million per plane net of specific reserves.

29.    By late 1998, Raytheon was aware of potential risks, uncertainties, and adverse trends in RAC's commuter business. For example, in October 1998, a RAC sales plan noted that the "US market continues to be soft for this size [of] aircraft." In December 1998, an internal Raytheon analyst wrote that "[t]he 19-seat turboprop market is in trouble" and described several factors that were "clearly putting the viability of the 1900D in doubt." Later that month, after being informed that "the market for the 1900D appears to be in decline" and "continuing 1900D financing is probably RAC's major financial exposure," Raytheon's new CEO observed that "clearly, the 1900D is a worry" and asked senior RAC management "how solid is our build/sell forecast?" The CEO further authorized a series of external studies into the future market demand for commuters and an internal financial analysis of the risks associated with these aircraft.

### Raytheon's Improper Disclosures and Accounting in 1997 and 1998

30.    Raytheon made no meaningful disclosures of the known risks, trends, and uncertainties associated with the deteriorating state of RAC's commuter business, such as the softening demand for commuters, the increasing trend in returns and repossessions, and the movement in RAC's commuter placement program away from sales and to begin offering leases, in any of the company's SEC filings from 1997 through 1998.

31.    Raytheon also engaged in improper accounting for RAC's commuter business that served to offset the negative effects that the declining commuter market was having on asset values for the 1900s during this time period. For example, Raytheon transferred $15 million in "corporate reserves" to RAC at year-end 1997, which RAC initially used to "off-set" potential exposures associated with over-valued 1900s. The company did not properly disclose or account for these reserves, however, which represented 7 percent of RAC's reported annual operating income that year. Although this $15 million charge should have been taken to ordinary operating

income, Raytheon reported it as a "special charge" reflecting the write down of unidentified "non-current assets" at RAC. In addition, instead of using the charge to write down the non-current commuter assets held for lease, RAC ultimately used this reserve to absorb losses incurred in subsequent periods when aircraft were refurbished.

32.    Furthermore, during 1997 and the first three quarters of 1998, Raytheon was aware that RAC had not implemented and was not complying with the requirements of FAS 125 (the new guidance for off-balance sheet accounting that became effective on January 1, 1997) to measure and record the assets and liabilities arising from its securitization arrangements. However, in its 1997 Form 10-K, the company stated that it had adopted this standard in 1997 and that this purported adoption "did not have a material effect on the company's financial position or results of operations." In 1998, Raytheon continued to be aware that "management ha[d] yet to record the sale of receivables in full accordance with FAS 125" and that "[t]he SEC has recently raised concerns about registrants' reporting under FAS 125." Yet, it was not until the fourth quarter of 1998 that RAC began to implement the aspects of FAS 125 related to the measurement and recording of assets and liabilities arising from the company's securitization arrangements. However, RAC based its FAS 125 calculations in 1998 on incomplete and inaccurate data and also improperly measured its recourse liability obligations on the receivables sold into the credit facility. As a result, for 1998, Raytheon reported additional operating income of $18 million on the sale of commuter receivables to the credit facility instead of a $9 million loss. Proper FAS 125 accounting would have reduced RAC's reported annual operating income by $27 million (11 percent) at year-end 1998.

33.    RAC also established reserves for commuter losses equal to any FAS 125 gains that were recognized on the sale of commuter receivables. This practice of making perfectly off-

setting adjustments left no trace on RAC's reported earnings. As a result, Raytheon's reported financial statements did not accurately reflect the accounting impact of declining commuter values. For example, in the fourth quarter of 1998, Raytheon recorded a $6.5 million gain on the sale of commuter receivables, which was offset by an equal $6.5 million reserve for commuters. No documentation supported the amount of the $6.5 million loss provision, and the amount reserved corresponded to nothing other than the amount of the recorded gain" At the time, the improper $6.5 million adjustment amounted to nearly 8 percent of the subsidiary's fourth quarter 1998 operating income of $82 million.

**In 1997 and 1998, Pliner Knew or Should Have Known of Raytheon's Improper Commuter Accounting**

34.     As Raytheon's lead auditor, Pliner knew or should have known of the improper commuter accounting practices alleged in Paragraph Nos. 22 through 33 above. And, in 1998, Pliner was further informed that RAC's commuter customers were "weak credits" that required "frequent restructurings and repossessions." At that time, Pliner also knew of the SEC's "focus" on "earnings management" and the "qualitative aspects" of "materiality" including the "impact on segment or interim data, [and the] impact on trend[s]." Yet, as alleged above in Paragraph No. 21, he still signed unqualified audit opinions for the company's 1997 and 1998 financial statements, which he knew or should have known misleadingly stated that these results complied with GAAP.

**The Deferral of Significant Commuter Losses in 1999**

35.     Throughout 1999, certain senior Raytheon and RAC officers were made aware of potential negative and adverse trends, uncertainties, and risks related to RAC's commuter business.

36.    In April 1999, an outside consultant informed senior Raytheon and RAC management that the commuter market was "at a turning point," that other "[c]arriers have begun to flood the market with…used 19-seat airplanes," that "lease rates for used 19-seat aircraft [we]re declining," that the "[d]ownward pressure on lease rates w[ould] grow as the surplus of 19-seat aircraft expands," and that "[a]dditional lease rate pressures could impact the company's asset values and re-marketing efforts." A senior Raytheon financial officer received a copy of this report and both he and other Raytheon officers were briefed on this situation and management's views of it.

37.    Also in April 1999, a senior Raytheon financial officer was informed that these "surplus" aircraft and "lower lease rates could drive declining asset values and represent a potential material write down" of the commuter assets. This officer was further informed that there was an "obvious" need for a "material write-down" of RAC's commuter assets, that these losses were "large and growing," that RAC was engaging in "misleading financial reporting," and that the situation was "as bad as [one executive had ever] seen." That same month, during their first meeting, Pliner discussed issues related to the commuters with this senior Raytheon financial officer.

38.    In May 1999, an internal Raytheon study forecasted that RAC's commuter portfolio would generate an estimated $95 million in losses due to "[t]he lack of portfolio equity, poor customer credit and payment behavior, high loan-to-value ratios, and the modest level of reserves" established for these assets. That same study identified a "worst case scenario" that could generate $200 million in additional losses depending upon the impact of the "upcoming introduction" of regional jets. A senior Raytheon financial officer received a copy of this report,

and both he and other Raytheon officers were briefed on this situation and management's views of it.

39.    In June 1999, Raytheon's then-Controller advised a senior Raytheon financial officer that there was an estimated exposure of $300 million to $500 million in marking the RACC portfolio to market.

40.    Also in June 1999, senior Raytheon officers received a "response" from RAC to the April and May 1999 external and internal studies. This response set forth the view of RAC management that there was greater demand for new commuter aircraft than forecast by the company's outside consultant. RAC's response also advised that it was "a corporate decision" whether to "build reserves" on the commuters, but this would occur "at the expense of current period profits." RAC's response instead proposed addressing the $95 million commuter exposure identified in May 1999 through "third party, no recourse notes," which would provide an estimated $93 million "improvement." These sales did not materialize, however. Yet, reserves were not adequately increased.

41.    In July 1999, in connection with an attempt to securitize all of RAC's aircraft receivables, the company's investment bankers informed Raytheon that the commuter portfolio should be valued "at a material discount to its current book value," that "actual collateral values may be substantially lower than loan balances," and that "[p]ortfolio policies may be masking problems from being recognized."

42.    In August 1999, as part of an initial consideration to divest RAC, senior Raytheon officers were informed that there was "approximately $250 Million - $350,Million risk in [the] $2.4 Billion loan/lease portfolio," and the "risk is likely to approach the high end of this range

over time" since "about 40% of loan/lease payments are delinquent" and "business cycle downturn may also drive up defaults [and] reduce residual values of used aircraft."

43.     In the Fall of 1999, after the initial effort to divest RAC failed, Raytheon attempted to sell RAC's portfolio of aircraft receivables (including its commuter receivables) to an outside finance company.  The finance company, however, informed Raytheon that it would not purchase any of the commuter loans due to concerns over their high loan-to-value ratios and high concentrations in certain customers.  The finance company also provided Raytheon with an independent valuation analysis of the 1900s, which stated that the commuter industry was experiencing a "distinct reduction in sales activity" and a "downturn" in leasing activity over the past year.  This report also listed estimated market values for the 1900s that were below their book values.

44.     In October 1999, due to unrelated difficulties in its defense businesses and engineering and construction unit, Raytheon announced an unexpected $640 million charge, which caused the price of the company's stock to fall 44 percent in one day.  This charge also led to a downgrading of the company's bond and credit ratings, and Raytheon management continued with the strategy to pay down the company's debt by divesting certain "non-core" commercial units.  As part of this strategy, senior Raytheon management undertook a new effort to divest RAC.

45.     In addition, following a number of production and accounting problems that arose at RAC as part of the year-end 1999 close, the subsidiary's CEO stepped down from his executive position, and Raytheon's CEO traveled to the subsidiary to make it clear that RAC personnel had to improve their processes to prevent similar issues from occurring in the future.

Pliner and others were aware of these issues, including that RAC had to reverse certain accounting entries before Raytheon could release its financial results in early 2000.

46.     Thereafter, in early 2000, RAC's newly-installed CEO instructed his staff to critically examine the subsidiary's operations, and RAC's Deputy CFO took the lead role in identifying issues to be examined. As part of this review, RAC personnel identified a potential $220 million exposure related to the commuter assets on and off the balance sheet. This estimate was calculated by comparing "[p]rices which could be readily obtainable in today's market" to commuter book values. The market values used in the analysis averaged from $500,000 to $1 million below the commuter book values. However, the company did not write down its commuter assets or adequately increase its commuter reserves at that time. Instead, based on overly optimistic internal analyses prepared by RAC executives, the company concluded that no "event of impairment" had occurred.

47.     In January 2000, Raytheon had announced that it expected fourth quarter 1999 earnings to be lower than consensus estimates, that it was reducing its 2000 earnings forecast by 50 cents per share (over $200 million), and that it planned to restate for RAC's improper bill and hold accounting practices. Following this announcement, Raytheon's stock price fell approximately 17 percent in one day. And, by March 2000, it was reported that Raytheon's bond and credit ratings might be further downgraded "[i]f corrective actions do not lead to material long-term improvements in overall performance and its balance sheet, or if material new operating problems emerge...."

**Raytheon's Improper Disclosures and Accounting in 1999**

48.     Raytheon's SEC filings for 1999 did not contain adequate disclosures of the negative and adverse trends, uncertainties, risks, and other information related to RAC's commuter aircraft or the subsidiary's commuter business.

49.     While Raytheon's 1999 Form 10-K did refer to "commuter valuation costs" as one of five factors affecting RAC's "decline in operating income as a percent of sales in 1999," this disclosure failed to provide adequate information concerning the known material and adverse risks, uncertainties, and trends posed by the commuters.

50.     In addition, the forward-looking statements in Raytheon's 1999 Form 10-K stated that "the effect of market conditions, particularly as it affects the general aviation market, the impact of competing products and pricing, [and] the impact on recourse obligations of RAC due to changes in the collateral value of financed aircraft" were among the many "factors that could cause actual results to differ," but did not mention "commuter" aircraft by name or provide adequate information about the negative trends, uncertainties, and risks concerning the commuters that were known to management at the time. Likewise, another set of forward-looking statements in Raytheon's 1999 Form 10-K stated that "continued market acceptance of, and government regulations affecting, 19-seat turboprop commuter aircraft" could affect RAC's future results of operations, but Raytheon did not disclose the significant information it had about the declining commuter market and the exposures facing the company.

51.     These forward-looking statements were inconsistent with disclosures in the footnotes to the company's 1999 financial statements, which misleadingly stated that "the Company does not expect to incur any material losses against the net book value of the long-term receivables" because "it is the Company's policy to have the aircraft serve as collateral for the

18

commuter airline receivables;" that "any liability arising from these transactions will not have a material effect on the Company's financial position, liquidity, or results of operations" given Raytheon's experience to date with resale activities and pricing and the Company's plan to continue production into the foreseeable future; and that "[t]hese financial instruments are recorded at estimated fair value. No material gain or loss resulted from the sales of receivables." As Raytheon was aware, the fair value of the commuter aircraft serving as collateral for the corresponding receivables was declining given the deteriorating market conditions for these planes. Yet, the company was not adequately increasing its reserves for these anticipated short falls, causing significant potential future liability under its recourse provisions to the revolving credit facility.

52.    In addition, contrary to the company's footnote disclosures, during 1999, RAC continued its incorrect practice of using FAS 125 gains on commuter receivables sold into the credit facility to set up equally off-setting commuter loss reserves. As a result, Raytheon's reported financial statements did not accurately reflect the accounting impact of declining commuter values.

53.    For example, in the third quarter of 1999, RAC increased its "cushion" for commuter losses by roughly $11 million given the improper FAS 125 gains it recognized on the sale of commuter receivables into the credit facility. RAC, however, subsequently reduced that increase by roughly $7 million in the fourth quarter of 1999 that offset a significant FAS 125 loss caused by a reduction in Raytheon's credit rating. These adjustments represented approximately 17 and 19 percent of the subsidiary's reported operating income/loss in the third and fourth quarters of 1999, respectively.

54.    Also, RAC still had not properly applied FAS 125 to its off-balance sheet commuter receivables during 1999.  As a result, RAC's reported annual operating income should have been reduced by at least $21 million (13 percent) at year-end.

### Near Conclusion of the 1999 Audit, Pliner Was Offered the Position of Raytheon's Corporate Controller

55.    During the course of the 1999 audit, Pliner continued to learn of Raytheon's deteriorating commuter business, and he knew or should have known about Raytheon's improper commuter accounting.  For example, Pliner knew of the additional commuter reserves established through FAS 125 gains during the third quarter of 1999.  And, at year-end 1999, Pliner informed members of senior Raytheon management of a "continued concern about commuter portfolio exposure," how "higher refurb[ishment] costs on used commuters" accounted of a $15 million decrease in RAC's operating profit that year, how the company "need[ed] to relook at FAS 125 calculations based on higher refurb costs," how the used commuter inventory was projected to be "higher than prior years" in 2000, and if there is "any slip," the commuter inventory "balance will balloon."  However, because he was offered a position as Raytheon's Corporate Controller shortly after presenting the audit results, Pliner rotated off the Raytheon engagement before the 1999 audit opinion was signed.

### In 2000, the Commuter Market Continued to Deteriorate

56.    In 2000, a variety of internal and external sources continued to inform Raytheon and RAC executives that the market for 1900s was in substantial decline.  These sources further indicated that there were actual material commuter losses at RAC and that the potential losses associated with the 1900 line were in the hundreds of millions of dollars.

57.    In January 2000, senior Raytheon and RAC officers learned that the company's strategic planning department viewed RAC as having a substantial negative economic value due

20

in large part to $240 million in negative value and exposure associated with RAC's off-balance sheet commuter and general aviation receivables.

58.    In February 2000, an outside consultant reported to Raytheon that there would be "[c]ontinued downward pressure on turboprop lease rates due to falling demand for new units and a growing supply of used capacity" and that "demand for new [commuters] will average 7 to 12 sales annually," well below what RAC was planning to manufacture that year.

59.    In March 2000, auditors with a major public accounting firm that had been retained to perform a review of RAC's "used commuter program exposures" informed members of senior Raytheon and RAC management that "the Company's largest exposure in the [commuter] portfolio is with potential returned aircraft" and that "the book values of certain aircraft in the portfolio exceed the current market values."  In particular, these auditors identified a $115 million "shortfall" associated with RAC's 1900Cs that were on and off the balance sheet, assuming a strategy of selling the aircraft for cash at their fair market value.  The auditors also noted that RAC personnel were "rejecting cash offers on commuter aircraft because of the income statement repercussions . . . [implying that] the carrying amounts of commuter airplanes exceed their fair market values."  The auditors further noted that RAC only wrote down used commuter asset values "when the Company enters into a new finance/lease transaction."  The auditors also reported that RAC lacked formal and documented policies and practices concerning the accounting for commuter aircraft, commuter loan restructurings, the creation of commuter valuation reserves, and the monitoring of customer accounts and collections.  Pliner received a copy of the report prepared by these auditors and discussed this report with a senior Raytheon financial officer after becoming Controller.

21

60.    In April 2000, Raytheon's internal audit department prepared a report for Pliner and other members of senior Raytheon and RAC management on the work that had been undertaken at the request of RAC's new CEO, as set forth in Paragraph No. 46 above. Although the report concluded that there was "[n]o event of impairment prior to 12/31/999" regarding the commuters, it did inform management that there was an "[u]ndetermined but likely to be significant" exposure related to the used commuter assets since "[t]he book values and refurbishment costs on used aircraft may exceed fair market value of cash sales...." The internal audit report further stated that there was another "undetermined" exposure associated with the subsidiary's commuter bad debt reserve since the "[v]aluation and review of assets [wa]s not performed timely or regularly." In addition, the internal audit report warned that there was "[n]o active collection effort" against delinquent commuter customers and the "non-performing segment" of the commuter portfolio was "increasing." The report also stated that management should "closely monitor this portfolio as changes will impact the accuracy of assumptions.... [A]ctions which might impair used commuters further include...change[s],in selling strategies and lease terms...large returns of aircraft which cannot be absorbed into lease market...[and an] overt decision not to support the line (such as pulling back significantly on new production)."

61.    In the months that followed, senior RAC executives tracked on a quarterly basis an estimated $220 million "net exposure" in the commuter portfolio given existing reserve levels, and these analyses were provided to others in senior RAC management.

62.    In June 2000, a RAC commuter marketing plan noted that loan values for 1900s continued to be "significantly above fair market values" by upwards of $1.3 million per aircraft. Shortly thereafter, a draft sales plan warned RAC personnel to "[m]anage used commuter reserves cautiously and avoid an accounting event."

63.    In July 2000, auditors with the same major public accounting firm that had previously analyzed RAC's "used commuter program exposures" prepared a report for a senior Raytheon financial officer and others at the company that analyzed Raytheon's off-balance sheet commuter receivables.  This report highlighted significant problems related to the commuters, including high levels of delinquencies and repossessions and "between $10 million and $200 million of collateral exposure" that was not reflected by RAC's accounting and restructuring methodologies, such as the practice of recognizing losses only upon a new sale or lease of the aircraft instead of upon return or repossession.  Pliner received a copy of this report.

64.    Between April and July 2000, Raytheon's outside investment bankers provided the company with a series of valuation analyses for the commuter receivables in connection with the company's efforts to sell RAC and/or its portfolio of commuter financing receivables to an outside buyer.  These analyses indicated that a sale of RACC's portfolio of commuter receivables might generate losses of between $63 million and $622 million on a secured basis, depending on the underlying assumptions, and that the value of discounted cash flows on the portfolio was between $200 million and $273 million lower than the total loan balances, depending upon the underlying assumptions.

65.    In the Summer of 2000, a senior RAC executive told two senior Raytheon officers of his significant concern about a problem with the commuters in the "half a billion dollar" range based on his view of the number of idle aircraft that were then in inventory and the substantial number of commuter returns that were forecasted at year-end.  Ultimately, Raytheon addressed this problem by transferring pension income to RAC to gradually build up commuter reserves.

**The Undisclosed Transfers of Pension Income**

66.     In the third quarter of 2000, a senior Raytheon financial officer approved the quarterly allocation of $14 million in surplus pension income to RAC each quarter on a going forward basis. This income was generated by an over-funded pension plan, which had been retained by Raytheon after the divestiture of another business unit, and subsequently merged with a RAC pension plan. As a result, RAC recognized $14 million in surplus pension income each quarter on a going forward basis, which was generated by the over-funded pension plan.

67.     As Pliner and others were aware, these surplus pension transfers were going to be used to fund a "general commuter reserve" at RAC, which would increase the company's "ability to absorb losses" and "allow us to continue to sell more 1900Cs versus continuing to lease them." In November 2000, Pliner told senior RAC executives to "[a]nticipate that the $14M per quarter coming from the 'over[-]funded pension income' is available indefinitely." Thereafter, RAC personnel projected that they would continue to receive $14 million in pension-related income per quarter through at least 2004, which would enable the subsidiary to build up nearly $260 million in commuter reserves.

68.     However, the surplus pension-related income was not separately identified and disclosed in any of the company's SEC filings because management viewed the amount as immaterial. In fact, $14 million represented 24 to 353 percent of RAC's reported quarterly operating income/loss between the third quarter of 2000 and the second quarter of 2001 (which ranged from a $4 million operating loss to $59 million in reported operating income). This income also eliminated the comparability of the segment's current results with prior periods and represented 17 percent of RAC's reported annual operating income in 2000. In addition, Raytheon's 2000 Form 10-K failed to disclose that, had the surplus pension income from the

discontinued operation not been reclassified to RAC's 2000 results, the RAC segment would have experienced a three-year decline in its reported annual operating income from $227 million in 1998, to $163 million in 1999, to $136 million in 2000.

### The Improper "Pooling" of Commuter Aircraft

69.    In the fourth quarter of 2000, at Pliner's direction, RAC personnel instituted an improper "pooling" analysis when testing RAC's on-balance sheet commuter assets for impairment under FAS 121.  This approach pooled aircraft on an aggregate basis, not on a plane-by-plane basis as required by GAAP.  Although Raytheon's outside auditors were informed of the approach, they did not agree with its use.  As Pliner was aware, pooling further enabled the company to use $45.7 million in "cushions" associated with low-book-value aircraft to off-set losses associated with higher-book-value aircraft, and these "benefits" were then used to lower the book values of its used 1900Bs and 1900Cs in small amounts at year-end 2000, and the company made no disclosure of the aircraft's declining value.

70.    In addition, even though the company's "pooling" analysis at year-end 2000 suggested that RAC did not need reserves on the 1900s that were held for sale, Pliner and others at the company kept $26.4 million in commuter reserves on RAC's books and continued to transfer $14 million in excess pension-related income to the subsidiary each quarter on a going forward basis for continued increases to a "general commuter reserve," which indicated that the anticipated losses associated with the 1900s were greater than the current level of reserves that had been established at RAC.

### The "Soft Landing" Plan for the Commuters

71.    By late 2000, Pliner and other senior Raytheon and RAC officers were informed that "[m]arket forces ha[d] created a non-performing asset problem" with the 1900s.

Specifically, contemporaneous internal company documents show that, at December 31, 2000, RAC's inventory of used commuters had increased to over 100 airplanes due to an exceptionally high number of commuter returns and repossessions at year-end, and RAC expected significant commuter returns in the years ahead.

72.    During January 2001, in response to a perceived "market shift" concerning the commuters, RAC prepared a "1900 Business Plan" intended to "steer[] to a 'soft landing' in 4 years" by (i) further reducing the build rate for new 1900Ds to one plane per month (the minimum production rate that the subsidiary could sustain without incurring an operating loss); (ii) moving away from RAC's historic commuter financing and leasing strategies to instead "sell 1900B[s and] 1900Cs for cash" at prices that were "well below" existing book values; and (iii) building up RAC's commuter reserves by at least an additional $240 million through the continued allocation of surplus pension-related income to facilitate such sales.

73.    The new "reduced cash sale prices" were approved by Pliner and others in senior Raytheon management during early January 2001, and the 1900 Business Plan projected that the revised "cash sale" values for the commuters would create at least $60 million in anticipated losses in 2001 alone.  These losses, however, would be charged against the reserves that were being built up at RAC through the transfers of surplus pension-related income and, thus, would not be reflected in Raytheon's reported financial statements.

74.    Pliner and others at the company were aware of the strategy to move to "cash sales," including the effort to "maximiz[e] conversion of 1900Cs for cash" and use "gross margin generated by additional [commuter sales] to fund more sales."

75.    Consistent with the company's new commuter business plan, by February 2001, RAC's commuter sales force was instructed that "the operating lease program they had relied

upon [in] the previous few years to place used commuters was gone.... In its place were new lower cash prices on 1900Cs and 1900Ds plus an emphasis on cargo sales."

### Raytheon's Inadequate Disclosures in 2000

76.    Raytheon's SEC filings for 2000 did not contain adequate disclosures of the negative, adverse, and material trends, uncertainties, risks, and other information described above related to RAC's commuter operations and the subsidiary's commuter line. Raytheon's SEC filings also did not disclose the merger of the over-funded pension plan from a discontinued business with a RAC pension plan, the resulting $14 million in surplus pension income that was available to RAC each quarter on going forward basis, or the improper testing of RAC's on-balance sheet commuter assets on a "pooled" basis. In addition, Raytheon's 2000 Form 10-K did not disclose the "soft landing" plan for RAC's commuter line, including the decision to emphasize cash sales at prices that were "well below" book values to address a perceived "market shift" in the commuter business.

77.    Although Raytheon's Forms 10-Q for the second and third quarter of 2000 did cite "pricing pressure on commuter aircraft" as one of the factors affecting RAC's operating income, these disclosures did not adequately describe the substantial negative information concerning the commuters that was known to management at the time. Similarly, Raytheon disclosed in its third quarter 2000 Form 10-Q that "a downturn in demand could have a material adverse effect on the company's financial position or results of operations" and in its 2000 Form 10-K that the company would "continue to...watch for any indications of a downturn in demand for RAC's aircraft," but these disclosures incorrectly suggested that management was not yet aware of any such downturn in the commuter aircraft market or its severity.

78.     In addition, while Raytheon's SEC filings for 2000 contained disclosures concerning the effect of overall market conditions in the forward-looking statements, these disclosures did not provide adequate information concerning the deteriorating state of the commuter aircraft market and the negative effect that this decline was having on RAC and commuter asset values.  For example, in its 2000 Form 10-K, Raytheon included the forward-looking statement that the company's "operating results may vary significantly over time for a variety of reasons, many of which are outside of our control," such as "the impact on recourse obligations at Raytheon Aircraft due to changes in the collateral value of financed aircraft…[and] general economic conditions, particularly the cyclical nature of the general aviation…market[] in which we participate."  These disclosures made no mention of "commuter" aircraft by name and did not reflect that the company was aware of significant losses related to RAC's commuter assets and anticipating that these losses would continue to grow in the future.

79.     Also, other forward-looking statements in the company's annual report disclosed that some of the "[i]mportant factors that could cause actual results to differ" were "the effect of market conditions, particularly in relation to the general aviation and commuter aircraft markets; [and] the impact on recourse obligations of Raytheon Aircraft due to changes in the collateral values of financed aircraft, particularly commuter aircraft."  These statements were contrary to other disclosures in the footnotes to the company's 2000 financial statements, which misleadingly stated that the company had a secure line of commuter financing receivables, that any liability resulting from the sale of commuter receivables into the revolving credit facility "will not have a material effect on the Company's financial position, or results of operations" given Raytheon's "experience to date with resale activities and pricing and the Company's plan

to continue production into the foreseeable future," and that "[n]o material gain or loss resulted from the sales of receivables in 2000, 1999, or 1998." These disclosures did not reflect a move to cash sales of commuter aircraft at prices that were well below book value, a significant reduction in the 1900D build rate, actual material commuter losses at RAC, and potential losses associated with the 1900 line in the hundreds of millions of dollars.

80.     Pliner reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 76 to 79 above.

### Raytheon's Improper Accounting in 2000

81.     From the early 1990s and throughout 2000, RAC used an improper reserve practice in its "Min/Max" reserve analysis, which was a non-GAAP practice of considering RAC's reserves in the aggregate and, thus, used over-accruals in some reserves to cover short-falls in others (rather than requiring RAC to support and record appropriate loss allowances for each probable and estimable contingency pursuant to FAS 5 and appropriate impairments for individual commuters available for lease pursuant to FAS 121). RAC's process of maintaining excess reserves in some areas because they off-set short-falls in reserves in other areas was not disclosed by Raytheon, was inconsistent with GAAP, and led to the keeping of inaccurate books, records, and accounts at the RAC segment. For example, between 1998 and 2000, RAC's excess reserves related to its parts business and general aviation aircraft, which were used to off-set under-accruals in other areas, such as those related to commuter receivables, totaled as much as $19.6 million and represented as much as 61 percent of the subsidiary's total reserves.

82.     In addition, as described in Paragraph Nos. 66 to 68 above, the establishment of $56 million in additional commuter reserves through the transfer of surplus pension income to RAC between the third quarter of 2000 and the second quarter of 2001 was inconsistent with

GAAP. No adequate contemporaneous documentation supported the amount of these commuter loss provisions, and the amount reserved corresponded only to the amount of the surplus pension income available. Pliner and others were also aware of these transfers and how they were used to increase commuter reserves.

83.    In 2000, Raytheon's outside auditors also informed Pliner and others that it was "not appropriate" to pool commuter aircraft when testing for impairment under FAS 121 because the planes "d[id] not represent a large pool of homogenous assets." The auditors, therefore, proposed a $12 million audit adjustment, which represented the supposed "benefit" that the company obtained through pooling. Raytheon, with the knowledge of its auditors, did not book the adjustment because the amount was considered to be immaterial to the company's consolidated financial results. Pliner and others were aware of this decision. The $12 million audit entry, however, represented approximately 7 percent of RAC's reported operating income for 2000 and, thus, was material to the financial results reported for that segment.

84.    In 2000, Raytheon's outside auditors further informed Pliner and other senior Raytheon and RAC executives that RAC "ha[d] not appropriately accounted for the gain or loss on notes sold to [the revolving credit facility]" or properly measured other components of the FAS 125 calculation and, thus, offered to sell RAC an improved FAS 125 model. After some "resistance" from Pliner and a senior RAC financial officer, the company did ultimately purchase and implement at the subsidiary the FAS 125 model that had been proposed by the auditors before filing the 2000 Form 10-K. However, this model also failed to comply with GAAP. Because much of the data serving as the inputs for this model was incomplete and inaccurate, the new FAS 125 model materially misestimated the amount of RAC's various off-balance sheet assets and liabilities.

85.    Also, the new FAS 125 model calculated a $22 million overstatement related to prior period FAS 125 gains, but Raytheon did not make this audit entry because, among other reasons, it was deemed immaterial to the company's consolidated financial results. Pliner and others were aware of the decision not to book this proposed adjustment. Such a charge, however, would have reduced RAC's reported annual operating income for 2000 by 13 percent (from $164 million to $142 million) and, thus, was material to the segment.

86.    Together, the $12 million proposed audit adjustment for incorrect FAS 121 accounting and the $22 million proposed audit adjustment for RAC's incorrect FAS 125 accounting would have reduced RAC's reported operating income by 20 percent.

87.    Finally, had senior Raytheon and RAC management timely recognized losses inherent in the "soft landing" of the commuter aircraft line, the company would have been required to take a charge of at least $67 million at year-end 2000, and contemporaneous internal company documents and other information indicate that Pliner and other senior Raytheon and RAC officers were expecting commuter losses of $240 million given the cash sales prices that had been approved in the "soft landing." A charge of $67 million to $240 million at year-end 2000 would have reduced RAC's reported annual operating income by at least 41 to 146 percent and Raytheon's 2000 profit before taxes by at least 8 to 27 percent.

88.    Pliner reviewed the accounting described in Paragraph Nos. 81 to 87 above, and he knew or should have known that it was inaccurate. Pliner also subsequently signed Raytheon's second and third quarter 2000 Forms 10-Q and the 2000 Form 10-K as the company's Chief Accounting Officer.

31

**In 2001, Pliner Continued to Be Aware of the Ongoing Decline in the Commuter Market, and these Assets Were Written Down after September 11, 2001**

89.    Throughout 2001, Pliner and other senior Raytheon executives continued to be aware of the ongoing decline of the commuter market and how this decline was creating serious operational issues at RAC, including substantial actual and anticipated losses associated with the 1900s on and off the company's balance sheet.

### The First and Second Quarters of 2001

90.    During the first quarter of 2001, Pliner had the lead RAC auditor removed from the engagement. According to Pliner, he lacked confidence in that partner and also had some concerns given the length of time that this partner had served on the RAC engagement (at least 16 years). However, the lead RAC auditor believed that he had been dismissed due to his unwillingness to "ignore SEC and GAAP errors" at Pliner's insistence. In 2000 and early 2001, that partner had requested various consults on certain accounting issues with his firm's national office and taken positions on other issues, which were resulting in adverse accounting treatments for the company. As Pliner wrote in a May 2001 client evaluation, he was "very dissatisfied with the quality of advice coming from the national office on accounting matters," viewing it as "overly conservative" and "not geared towards helping companies solve problems."

91.    By April 2001, Pliner and others at Raytheon were informed that RAC had not sold any used commuters for cash under the "soft landing" plan during the first quarter and that recent offers for used 1900Cs were "in the $1.2M range," which was "far below" the initial "cash sale" estimates of $2.2 million approved as part of the "soft landing." Specifically, Pliner and others received an e-mail from the head of RAC's commuter sales department, which further stated that "each cash order looks like it will require a great deal of focus and effort to get the ball over the goal line. Simply put, it's harder to sell for cash, but...we knew this 'going in.'" In

response to this statement, one senior Raytheon executive explained that $1.5 million was a "more realistic" price for these used aircraft and further emphasized the need to "raise cash" on these sales.

92.     In May 2001, Pliner disapproved of the sale of $200 million in commuter receivables to an outside party since it would occur at a $20 million (10 percent) discount. Even though Pliner was informed that RAC's "surplus" pension-related reserves could be used to off set this loss, he explained that "we need to understand what a 10% loss on the $200M RACC portfolio sale does to our collateral value on the rest of the portfolio. Any use of $20M of pension reserves will severely limit our ability to sell on-balance sheet aircraft for cash." A senior Raytheon financial officer was also aware of this situation.

93.     In June 2001, a RAC sales forecast informed a senior Raytheon financial officer and others that "[a] clear trend exists that prices will have to continue to be lowered to move inventory.... In order to get more cash sales in Q4, the price will have to be lowered to between $1.1 - $1.5 MM. This could create accounting issues." Pliner and others subsequently received an e-mail from a senior executive in RAC's commuter business, which stated that it would be necessary to "discount heavily" and offer 1900Cs at between $1.1 million to $1.5 million in order to make sales for cash. These officers were further informed that RAC's 2001 sales forecast was "contingent" upon these values.

94.     These transactions, however, were blocked by Pliner and others in the financial organization because "these deals could cause a write down of the entire portfolio and, as a result, we need to sell the airplanes at a higher value." As set forth in internal company documents, "[w]e cannot afford to change NRVs [the Net Realizable Values of the aircraft] below $2,500,000" due to the income statement repercussions for the company. "Price integrity

issues and limited reserves prevent us from lowering prices to meet a large portion of the market. Market pricing will require additional reserves."

95.    In July 2001, the company's investment bankers provided Raytheon with an update of earlier analyses of the company's commuter portfolio. This analysis indicated that, at the close of the second quarter, there was at least $113 million to $198 million in losses associated with the on- and off-balance sheet commuters given the difference between their book and assumed collateral values. This analysis also indicated that the value of the discounted cash flows from the on- and off-balance sheet commuters were $431 million to $528 million below their total book values.

96.    In August 2001, Raytheon convened a "commuter summit" at its corporate headquarters to discuss the state of the commuter market and the negative effect this decline was having on RAC's commuter business. At this meeting, an outside consultant informed Pliner and others in senior Raytheon and RAC management that "[c]ompetitive market pressures are intense. Critically, they are not anticipated to ease anytime soon.... Turboprop aircraft orders have stagnated at best.... Only a handful of companies still operate 19-seat turboprops.... The prognosis for U.S. 19-seat operators is not very good.... Downward pricing pressure is not anticipated to ease as the number of surplus 20 to 35 seat turboprop aircraft grows, making them more attractive as 19-seat replacements.... With turboprop aircraft demand falling and supply raising, pricing must reflect basic market conditions not internal benchmarks."

97.    At this "commuter summit," another outside consultant reported that estimates of fair market value for the commuters were, on average, $2 million below book value for the 1900Cs and $1.3 million below book value for the 1900Ds. At the time, the company had over

130 1900Cs and nearly 320 1900Ds on and off the balance sheet, making for an estimated exposure of approximately $676 million.

### Raytheon's Improper Disclosures in the First and Second Quarters of 2001

98.     Despite the substantial information that management possessed concerning the decline in RAC's commuter aircraft business and the erosion of commuter asset values, the company's first quarter 2001 Form 10-Q did not adequately disclose these adverse views of and developments in RAC's commuter operations, including management's decision to move from a leasing to a cash sales strategy for used commuters.

99.     For example, although this filing did state that, "[d]uring the first quarter of 2001, RAC experienced softness in orders for new and used commercial aircraft," that Raytheon "remains concerned about the market outlook at RAC," and that "[w]eak demand for RAC's new or used aircraft could have a material effect on RAC's financial position and results of operations," these disclosures only "commercial" aircraft in general, which covered several other product lines in addition to the commuters.  Because these and other disclosures covered all of RAC's "new and used" commercial aircraft, the company's filing did not make adequate disclosure of the negative risks and trends related to the commuters that were known to senior management at the time.

100.     Raytheon's second quarter 2001 Form 10-Q, which was filed one week after the August 2001 commuter summit, also did not adequately disclose the negative risks and trends associated with the company's commuter aircraft.  Raytheon's disclosures included that RAC's second quarter 2001 "[o]perating income was down primarily due to the lower sales volume and margin pressure on T-6A, Beechjet, and used aircraft due to the current market environment. During 2001, RAC experienced softness in orders for new and used commercial aircraft.  The

Company remains concerned about the market outlook at RAC.  During the second quarter of 2001, RAC responded to a softening market by announcing workforce reductions and adjustments in production rates."  These disclosures also made no specific mention of "commuter" aircraft, however, and failed to adequately disclose the negative risks and trends concerning the commuters that were known to senior management at the time.

101.    The only disclosure specifically referencing "commuters" in the Management Discussion and Analysis section of Raytheon's second quarter 2001 filing concerned "[t]he aging on RAC's commuter customer financing receivables [which] has deteriorated over the past year. Non-performance on these loans and leases, in the aggregate, could have a material adverse effect on the Company's liquidity."  At this time, senior Raytheon officers had been informed that there were hundreds of millions of dollars of actual and potential losses associated with these receivables based on the analyses that the company's investment bankers had performed and the other information the company had received.  Thus, Raytheon failed to adequately disclose the significant declines in the commuter market, recent restructuring of several commuter customers to keep them from defaulting on their notes payable, and the substantial financial repercussions that would follow given the company's recourse obligations to the bank facility.

102.    Also, both of Raytheon's first and second quarter 2001 filings contained inadequate disclosures about the potential effect of market conditions in its forward-looking statements.  In particular, both Forms 10-Q stated that of the many "[i]mportant factors that could cause actual results to differ" were "the effect of market conditions, particularly in relation to the general aviation and commuter aircraft markets; [and] the impact of recourse obligations of Raytheon Aircraft due to changes in the collateral values of financed aircraft, particularly

commuter aircraft." These disclosures, however, failed to provide investors with sufficient information concerning the negative trends and risks associated with the commuters that were known by management at the time. The inclusion of these disclosures in the company's forward-looking statements gave the inaccurate impression that Raytheon was not presently facing any risks associated with its on- and off-balance sheet commuter assets during these time periods.

### Raytheon's Equity Offering

103.    In April and May 2001, Raytheon filed a Form S-3 and prospectus supplements in connection with its $3 billion shelf registration and takedown of equity securities. These filings contained materially misleading statements and omissions concerning the commuters because:

(a)    Raytheon's Form S-3 incorporated prior filings by reference and thus repeated the false and misleading statements from those periodic reports. In addition, the Form S-3 did not disclose the material and adverse trends and uncertainties that were known to management at the time concerning the commuters. The Form S-3 also incorporated by reference "any future filings made by us...until we sell all of the securities." As alleged below, these future filings were also misleading.

(b)    In addition, the forward-looking statements of the Form S-3 contained disclosures about "regional aircraft" and "price pressures within the market" but did not specifically reference commuters by name. Similarly, these forward-looking statements disclosed that "a decline in demand in the market for our aircraft, would have an adverse effect, which may be material, on our financial results," but did not describe the declining commuter market or RAC's deteriorating commuter business. Likewise, other forward-looking statements disclosed that "[t]he value of our securities may fluctuate as a result of considerations that are difficult to forecast, such as...the impact on recourse obligations

at Raytheon Aircraft Company due to changes in the collateral value of financed aircraft...and general economic conditions, particularly the cyclical nature of the general aviation and other commercial markets in which we participate." These forward looking statements, however, did not specifically mention the known risks posed by the deteriorating state of the commuter market, RAC's growing inventory of used commuter aircraft, or the over-valued commuter financing receivables that were off the company's balance sheet.

104.    Pliner reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 98 to 103 above.  Pliner further signed Raytheon's first and second quarter 2001 Forms 10-Q as the company's Chief Accounting Officer, and he signed the company's April 2001 Form S-3 as Raytheon's Principal Accounting Officer.

**Raytheon's Improper Disclosures and Accounting in the Third Quarter of 2001 and at Year-End**

105.    Although Raytheon's on- and off-balance sheet commuter assets were over-valued by hundreds of millions of dollars as of August 31, 2001, it was not until after the terrorist attacks on September 11th that management began the process of a write down.  However, much of the information which management used to estimate fair value for the commuters was "from three weeks earlier or four weeks earlier, in August of 2001.... [N]one of the publicly available data [used in the write-down analysis] were post-September 11th."  Pliner and a senior Raytheon financial officer also considered offers that RAC had received from commuter customers during "the most recent year," even though these officers had previously refused to sell planes for these prices in July 2001 since "these deals could cause a write down of the entire portfolio...."  Also, a post-September 11th "top down, market study" upon which senior Raytheon officers relied to support the final charge estimated that there was $400 million to $500 million in pre-existing

38

exposure on the commuters as of July 2001. This amount represented roughly 60 to 70 percent of the $693 million charge that was ultimately taken by the company. As the Vice President of Investor Relations informed senior management near completion of the write down, a survey of buy- and sell-side analysts prior to the upcoming earnings call indicated that "defense companies get a free pass this quarter" given recent events. These analysts were further "expecting a $400-500 million charge" on the commuters, and they would be "irritated" with the company "if we do not take this opportunity to adjust these values."

106.    Thus, in the third quarter of 2001, Raytheon stated that it had taken a $693 million loss provision related to RAC's commuter aircraft as "a result of continued weakness in the commuter aircraft market and the impact of the events of September 11, 2001." This misleading statement was repeated in substance in the company's 2001 Form 10-K. Given the charge that the company should have taken at year-end 2000 to properly account for RAC's on- and off-balance sheet commuter assets and the $240 million in commuter reserves that the company planned to build to cover anticipated losses, the $693 million commuter loss provision that Raytheon took in the third quarter of 2001 was materially overstated by at least 10 to 53 percent.

107.    Raytheon's SEC filings also did not disclose that the third quarter 2001 commuter loss provision was largely determined by implementing for the first time a market-based measure of portfolio loss under FAS 140, the successor to FAS 125. Contrary to Raytheon's prior public disclosures, the company's recourse liability obligations on the commuter receivables sold into the credit facility had previously been calculated through a pooled, probable loss analysis.

108.    In addition, Raytheon's SEC filings did not disclose that certain "excess" non-commuter reserves totaling over $16 million, such as those related to RAC's parts business and general aviation aircraft, which had previously been used in the Min/Max analysis to off-set

under-accruals on the commuters, were not written off in the third quarter of 2001. Instead, these reserves were retained by the company for their original, specified purposes, indicating that they should not have been used to off-set deficiencies in the commuter reserves in prior periods.

109. Pliner reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 106 to 108 above. Pliner also reviewed the accounting described in Paragraph Nos. 106 to 108 above, and he knew or should have known that it was inaccurate. Pliner further signed Raytheon's third quarter Form 10-Q and the 2001 Form 10-K as the company's Chief Accounting Officer.

**THE IMPACT OF THE IMPROPER ACCOUNTING AND DISCLOSURE PRACTICES**

110. As a result of the improper disclosure and accounting practices described above, Raytheon filed at least fifteen quarterly reports, five annual reports, and four registration statements that contained materially false and misleading disclosures and financial statements.

**THE NEED FOR AN INJUNCTON**

111. By engaging in the conduct alleged above, Pliner violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)] and aided and abetted violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 77m(a), 77m(b)(2)(A), and 77m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-13, and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, and 240.13b2-1]. Unless enjoined, Pliner is likely to commit or aid and abet such violations in the future.

**FIRST CLAIM**
**Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act**

112. Paragraphs 1 through 111 above are realleged and incorporated herein by reference.

113.    Raytheon filed registration statements on January 15, 1998, July 9, 1999, April 6, 2001, and October 22, 2001 in connection with securities offerings by Raytheon that incorporated certain false and misleading periodic reports previously filed by the company as well as the unqualified opinions from the 1997 and 1998 audits of the company's financial statements.

114.    In these offers or sales of securities, Pliner, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the offer or sale of Raytheon securities, (a) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and (b) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

115.    By reason of the foregoing, Pliner violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

### SECOND CLAIM
**Aiding and Abetting Violations of
Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13**

116.    Paragraphs 1 through 115 above are realleged and incorporated herein by reference.

117.    As alleged more fully above, Raytheon filed with the Commission materially false and misleading financial statements as part of its annual reports on Form 10-K and quarterly reports on Form 10-Q, respectively.

118.    As a result of the foregoing, Raytheon violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

119.    Pliner knowingly or recklessly provided substantial assistance to Raytheon in connection with its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

120.    As a result of the foregoing, Pliner aided and abetted Raytheon's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

**THIRD CLAIM**
**Aiding and Abetting Violations of**
**Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rule 13b2-1**

121.    Paragraphs 1 through 120 above are realleged and incorporated herein by reference.

122.    As alleged more fully above, Raytheon failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets. Raytheon also directly or indirectly, falsified or caused to be falsified certain books, records, and accounts. In addition, Raytheon failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP, or any other applicable criteria, and to maintain accountability for assets.

123.    As a result of the foregoing, Raytheon violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

124.    Pliner knowingly or recklessly provided substantial assistance to Raytheon in connection with its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

125.    As a result of the foregoing, Pliner aided and abetted Raytheon's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

(a)    ordering Pliner to pay a civil penalty in the amount of $150,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and to pay disgorgement of certain past bonus payments in the amount of $325,000 and pre-judgment interest thereon in the amount of $90,042;

(b)    permanently enjoining Pliner from violating, directly or indirectly, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)], and permanently enjoining Pliner from aiding or abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 77m(a), 77m(b)(2)(A), and 77m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-13, and 13b2-1 [17 C.F.R. §§ 240.12b-20, 13a-1, 240.13a-13, and 240.13b2-1]; and

(c)    granting such other and further relief as this Court deems just and proper.

Dated: March **15**, 2007
        Washington, DC

John D. Worland, Jr.
Timothy N. England
Beth Collier Groves
Christopher J. Stewart
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-0713
(202) 551-4438
(202) 772-9231 (Fax)

44

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Edward S. Pliner |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    88888 (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Christopher J. Stewart Securities and Exchange Commission 100 F Street NE Washington, DC 20549 202-551-4542 | ATTORNEYS (IF KNOWN) Harry Weiss and Laurie Stegman Wilmer Hale LLP 1875 Pennsylvania Avenue, NW Washington, DC 20006 |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

⦿ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**⦿ E. General Civil (Other)**    OR    **○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.  Habeas Corpus/ 2255** | ○ **H.  Employment Discrimination** | ○ **I.  FOIA/PRIVACY ACT** | ○ **J.  Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |

| ○ **K.  Labor/ERISA (non-employment)** | ○ **L.  Other Civil Rights (non-employment)** | ○ **M.  Contract** | ○ **N.  Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V.  ORIGIN**

◉ **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Settled civil action for violations of the federal securities laws under 15 U.S.C. 77q(a)(2) and (3) and 15 U.S.C. 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)

| **VII.  REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐    NO ☐ |

**VIII.  RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  **3/15/07**    SIGNATURE OF ATTORNEY OF RECORD  _____

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.